**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**IN THE MATTER OF THE SEARCHES OF:**

| | |
|---|---|
| THE BUILDING, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 156 Nichol Avenue, McKees Rocks, PA 15136 (Also listed as 156 Ohio Street, McKees Rocks, PA 15136. Also Listed as 154 Ohio Street, McKees Rocks, PA 15136) (Search Location 1) | Magistrate No. 20-2424<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 25 Deerton Road, Cheswick, PA 15024 (Search Location 2) | Magistrate No. 20-2425<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 124 Earl Street, Pittsburgh, PA 15204 (Search Location 3) | Magistrate No. 20-2426<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 308 Campbell Street, Apartment B, McKees Rocks, PA 15136 (Search Location 4) | Magistrate No. 20-2427<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 2780 Hunters Circle, Apartment 421, Allison Park, PA 15101 (Search Location 5) | Magistrate No. 20-2428<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 150 Southern Avenue, Apartment 3, Pittsburgh, PA 15211 (Also listed as 150 Southern Avenue, Basement Apartment, Pittsburgh, PA 15211) (Search Location 6) | Magistrate No. 20-2429<br><br>**[UNDER SEAL]** |

| | |
|---|---|
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 3006, Unit #2, Shadeland Avenue, Pittsburgh, PA 15212 (Search Location 7) | Magistrate No. 20-2430<br><br>**[UNDER SEAL]** |
| THE STORAGE UNIT NUMBER 3112 LOCATED AT EXTRA SPACE STORAGE, 880 Saw Mill Run Boulevard, Pittsburgh, PA 15226 (Search Location 8) | Magistrate No. 20-2431<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 245 Alice Street, Apartment 1, Pittsburgh, PA 15210 (Search Location 9) | Magistrate No. 20-2432<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 316 Elsdon Street, Pittsburgh, PA 15214 (Search Location 10) | Magistrate No. 20-2433<br><br>**[UNDER SEAL]** |
| THE RESIDENCE, CURTILAGE AND ANY DETACHED STRUCTURES AND/OR OUTBUILDINGS LOCATED AT 639 Churchill Avenue, Pittsburgh, PA 15235 (Search Location 11) | Magistrate No. 20-2434<br><br>**[UNDER SEAL]** |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANTS

I, John Ypsilantis, a Special Agent (SA) with the Federal Bureau of Investigations, being duly sworn, depose and state as follows:

## I.   INTRODUCTION AND AFFIANT BACKGROUND

1.      This Affidavit is submitted in support of search warrants for locations associated with individuals named as defendants in three (3) related Indictments, as forth below, as there is probable cause to believe that searches of the locations identified above and more fully below (hereinafter collectively referred to as "SEARCH LOCATIONS") will produce fruits of, or

2

evidence of, violations of federal felony offenses enumerated in Title 21, United States Code, Sections 841(a)(1) (distributing and/or possessing with intent to distribute a controlled substance (methamphetamine, cocaine, and heroin)), 846 (conspiring to commit a drug trafficking crime); and Title 18, United States Code, Sections 922(g)(1) (felon in possession of firearms/ammunition), 924(c) (possession of a firearm in furtherance of a drug trafficking crime), (hereinafter "TARGET OFFENSES").

2.     I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed since May 2017.

3.     As a Special Agent with the FBI, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     As a Special Agent with the FBI, I am currently assigned to the Greater Pittsburgh Safe Streets Task Force (the "Task Force") and have been so assigned since October 2017.  I was employed as a U.S. Border Patrol Agent with Customs and Border Protection (CBP) from July 23, 2009 to May 13, 2017.  From January 2012 until May 2017, your Affiant was assigned as a Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

5.     From 2009 to the present, your Affiant has received extensive training in a variety of investigative techniques and legal matters, including Fourth Amendment searches and the legal requirements for the interception of telephone communications, as well as  specialized training on topics such as drug interdiction, drug detection, money-laundering techniques and schemes, drug identification, asset identification and removal, and methods utilized by organized

criminal enterprises and drug trafficking organizations to carry out the aforementioned criminal conduct.

6.     During the course of your Affiant's employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal and national security investigations, as well as investigations of criminal organizations involved in both the manufacturing and distribution of controlled substances.   The investigations have resulted in the arrest and prosecution of individuals who have smuggled, received, and distributed controlled substances.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including: physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), analysis of telephone records, witness interviews, execution of search warrants, pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, as well as audio and audio/video recording devices. Additionally, I have personally participated in Title III wiretap investigations, pursuant to 18 U.S.C. § 2516, in the Northern District of Ohio and the Western District of Pennsylvania.

7.     For instance, within the last two (2) years, your Affiant was the lead agent in a federal investigation into a violent, neighborhood street gang known as "SCO".  As a result of that investigation, from January of 2019 through May 2019, your Affiant obtained nine (9) Title III wiretap authorizations.  As a result of that wiretap investigation, thirty-three (33) individuals were charged by a federal grand jury in three (3) related Indictments for violations of federal drug and firearm laws.   *See US v. Chadlin Leavy, et al*., Crim. No. 19-160 (WDPA June 4, 2019), *US v. Howard McFadden, et al*., Crim. No. 19-162 (WDPA June 4, 2019), *US v. Eric Vanderslice*, et al., Crim. No. 19-163 (WDPA June 4, 2019).

8.      Through the investigations that I have participated in, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, outlaw motor cycle gangs, and street gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and/or firearms, and to collect and launder related proceeds.

## II.    <u>LOCATIONS TO BE SEARCHED</u>

9.      This Affidavit is made in support of an Application for search warrants authorizing the search of the following locations (collectively referred to as the "SEARCH LOCATIONS"):

a.      **156 Nichol Avenue, McKees Rocks, PA 15136 (Also listed as 156 Ohio Street, McKees Rocks, PA 15136.  Also Listed as 154 Ohio Street, McKees Rocks, PA 15136)** ("Search Location 1" – PAGAN'S MC Pittsburgh Chapter Clubhouse), its curtilage, any detached structures or outbuildings at the location or on the curtilage, and all safes, computers and telephones located therein. <u>See</u> Attachment A-1 for description.

b.      **25 Deerton Road, Cheswick, PA 15024** ("Search Location 2" – residence of Bill RANA), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. <u>See</u> Attachment A-2 for description.

c.      **124 Earl Street, Pittsburgh, PA 15204** ("Search Location 3" – residence of Jason EVANS), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. <u>See</u> Attachment A-3 for description.

d.      **308 Campbell Street, Apartment B, McKees Rocks, PA 15136** ("Search Location 4" – residence of Patrick RIZZO), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. <u>See</u> Attachment A-4 for description.

e.      **2780 Hunters Circle, Apartment 421, Allison Park, PA 15101** ("Search Location 5" – residence of Anthony PELUSO), its curtilage, any detached

structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-5 for description.

f.   **150 Southern Avenue, Apartment 3, Pittsburgh, PA 15211 (Also listed as 150 Southern Avenue, Basement Apartment, Pittsburgh, PA 15211)** ("Search Location 6" – residence of Jeffrey KUSHIK), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-6 for description.

g.   **3006 Shadeland Avenue, Unit #2, Pittsburgh, PA 15212** ("Search Location 7" – residence of Misty WALKER), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-7 for description.

h.   **UNIT NUMBER 3112, EXTRA SPACE STORAGE, 880 Saw Mill Run Boulevard, Pittsburgh, PA 15226** ("Search Location 8" – storage of Misty WALKER), all safes, computers and telephones located therein. See Attachment A-8 for description.

i.   **245 Alice Street, APT 1, Pittsburgh, PA 15210** ("Search Location 9" – residence of Darian WOFFORD), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-9 for description.

j.   **316 Elsdon Street, Pittsburgh, PA 15214** ("Search Location 10" – residence of Gary HAIRSTON), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-10 for description.

k.   **639 Churchill Avenue, Pittsburgh, PA 15235** ("Search Location 11" – residence of Randy CAMACHO), its curtilage, any detached structures or outbuildings at the location or on the curtilage, as well as vehicles adjacent to or thereon, and all safes, computers and telephones located therein. See Attachment A-11 for description.

10.   Specifically, the purpose of this Application is to seize all records, evidence, fruits, and instrumentalities, more particularly described in Attachment B to each warrant, of violations of the TARGET OFFENSES, contained in the above-listed locations, which are more fully described in Attachment A to each warrant.

6

III.   **EVIDENCE COMMONLY GENERATED BY DRUG TRAFFICKING AND ILLEGAL FIREARM POSSESSION**

11.     Based on my training and experience, and consultations with other federal, state and local law enforcement personnel, your Affiant is aware, that the following kinds of evidence have been recovered in a substantial number of searches executed in connection with drug trafficking and illegal firearms possession investigations and that the following is generally true of those engaged in illegal drug and firearms trafficking, among other violations of law:

a.      Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances – such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags," microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, inositol, fentanyl, and vitamin B12. In addition, as a result of conversations with Assistant United States Attorneys, who have prosecuted drug trafficking cases in federal court, your Affiant is aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was directly observed to occur there.  *See United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (explaining that, in drug cases, evidence is likely to be found where drug dealers reside).  Based upon your Affiant's training and experience, your Affiant is further aware that drug traffickers often conceal evidence of their crimes in various locations throughout their residences, including in children's bedrooms, playrooms, and common spaces, where they believe such evidence will be concealed from law enforcement scrutiny.

b.      Drug traffickers also maintain records relating to their trafficking activities in these same places.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986).  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.  *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).  These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates.  These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to

their trafficking activities within electronic communication devices.  Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances.  They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

c.      Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' supplier(s) and the traffickers' dealer(s).  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and must keep them immediately available to efficiently conduct their drug trafficking business.

d.      Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities.  In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities.

e.      Drug traffickers also often employ security measures such as alarm systems, surveillance systems and security cameras and/or monitoring devices at these locations, in an effort to detect law enforcement presence, as well as to protect their product, person and proceeds, which often record the comings and goings of individuals involved in the illegal activity.

f.      Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers and, in so doing, acquire or rent property, services, and personal identification items (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

g.      Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

h.      Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places.  These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances.  After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

i.      Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business.  Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs.  To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier.  Evidence related to the identities of these co-conspirators are often maintained in these locations.

j.      Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business.  In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements.  Individuals involved in drug trafficking often attempt to legitimize the source of these profits.  In order to do this, they attempt to secrete, transfer and conceal the money by, among other ways: (a) placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding money in their homes, safes, or safety deposit boxes; (d) using money to buy assets which are hard to trace by law enforcement.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either at the residence and/or vehicles of the drug trafficker or at the residence of the person in whose name the asset is listed.

k.      Additionally, based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain

evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations. It should be noted that possession of the valuable items referenced herein, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use.

l.      It is also a generally common practice for traffickers to conceal at their residences, and/or in their vehicles (particularly if they have a trap/hidden compartment), large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences and/or vehicles of those involved in selling drugs or in the residences and/or vehicles of relatives or trusted associates.

m.      Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations. Your Affiant is aware that drug traffickers sometimes take trophy photographs of their drugs and drug proceeds and retain them in their residences and/or vehicles. Your Affiant is aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity. These photographs may be maintained in hard copy format; however, many photographs are now taken and maintained on electronic devices, including but not limited to: digital cameras, cellular telephones, tablets and computers.

n.      Individuals involved in an outlaw motorcycle gang (OMG) have general characteristics, including: (1) an association of three or more individuals; (2) whose members collectively identify themselves by adopting a group identity which they use to create an atmosphere of fear or intimidation frequently by employing one or more of the following: a common name, slogan, identifying

sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti; (3) the association's purpose, in part, is to engage in criminal activity and the association uses violence or intimidation to further its criminal objectives; (4) its members engage in criminal activity, or acts of juvenile delinquency that if committed by an adult would be crimes; (5) with the intent to enhance or preserve the association's power, reputation, or economic resources; (6) the association may also possess some of the following characteristics: (a) the members employ rules for joining and operating within the association; (b) the members meet on a recurring basis; (c) the association provides physical protection of its members from other criminals and gangs; (d) the association seeks to exercise control over a particular location or region, or it may simply defend its perceived interests against rivals; or (e) the association has an identifiable structure. <u>See</u> https://www.justice.gov/criminal-ocgs/gallery/outlaw-motorcycle-gangs-omgs?page=1. Thus, evidence of this association among conspirators (including regalia, clothing and other items of identification) is both relevant and likely to be found within an OMG member's residence, vehicle, and common areas shared by these members.

o.     Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, and vehicles.

p.     Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore, I am requesting permission to search all vehicles and outbuildings located at each of the locations requested.

q.     Your Affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in

furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

r.      I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities, the use of gambling and gambling machines both legally and illegally, and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

s.      Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

t.      Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

u.      There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents (such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications), receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

v.      Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money orders, green dot cards, prepaid credit cards, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence or place of business.

w.      Additionally, the cellular telephone, in addition to weapons, is a primary tool of the drug trade.  Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business.  Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cellular telephones.  The data on current or past cellular telephones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.  Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, your Affiant is aware that collections of cellular telephones have been found during drug trafficking search warrants that have included cellular telephones that were no longer being used by a particular drug trafficker but had nevertheless been retained.  Finally, it has become common for drug traffickers to utilize computers, cellular telephones, and/or other electronic media for communication and data-acquisition and data-retention purposes.  It is now not uncommon for drug traffickers to have email accounts or various apps for cellular telephones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

x.      Evidence of drug crimes can be found in the cellular telephones/computers/electronic media referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via

emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cellular telephones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

y.      As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cellular telephone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

z.      Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cellular telephone. In addition to electronic communications, a user's internet activities generally leave traces in the web cache and internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cellular telephone, used such a device.

aa.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary Internet

directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

bb.    The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

12.    My awareness of these drug trafficking practices, as well as my knowledge of drug use/distribution and money laundering techniques as set forth in this Affidavit, arise from, among other things, the following:  a) my own involvement in this and prior drug investigations and searches during my career, as previously described; b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me of when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) review of thousands of intercepted telephone communications between drug traffickers during which the traffickers have discussed the topics referenced herein.

13.    The statements in this Affidavit are based, in part, on information provided by witnesses and your Affiant's investigation of this matter.  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are

necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are presently located at the SEARCH LOCATIONS.

## IV.    FACTS ESTABLISHING PROBABLE CAUSE

### A.    Background of the Investigation

14.    Beginning in January of 2020, the FBI Greater Pittsburgh Safe Streets Task Force (the "Task Force") began a long-term, federal Organized Crime Drug Enforcement Task Force (OCDETF) investigation into the criminal activity, including drug and firearms trafficking, of individuals who are members and/or associates of a violent, outlaw motorcycle gang known as the Pagan's Motorcycle Club (hereinafter, the "Pagans" or the "PMC"[1]).

15.    The Task Force is comprised of federal, state, and local agencies, including agents, officers and/or detectives of the FBI, United States Postal Inspection Service (USPIS), Drug Enforcement Administration (DEA), Pennsylvania State Police (PSP), Pennsylvania Office of Attorney General (POAG), Pittsburgh Bureau of Police (PBP), and Allegheny County Sheriff's Office (ACSO).

16.    This investigation, however, has also led to identifying a much larger illegal drug trafficking network operating in and around the Greater Pittsburgh Area and the Western District of Pennsylvania, among other places.

17.    Initially, members of the Task Force received information from independent sources,  including law enforcement and confidential sources (collectively, the "Sources"), about the PMC Pittsburgh Chapter's leaders, members, and/or associates as well as their involvement in, among other criminal activity, illegal drug and firearms trafficking.

---

1.    Unless otherwise noted, throughout this Affidavit, the term "Pagans" or "PMC" will be utilized to collectively describe the members, facilitators, and/or sources(s) of supply involved or believed to be involved in this ongoing drug trafficking conspiracy in regard to the PMC Pittsburgh Chapter.

18.     More specifically, and relevant to this Affidavit, investigators received information pertaining to the suspected illegal activity of Bill RANA (aka "Pittsburgh Billy"), Eric ARMES (aka "Knuckles"), Jason EVANS (aka "Shahid"), and Patrick RIZZO, who have been identified as suspected members of the PMC Pittsburgh Chapter, as well as Phillip BONANNO, who has been identified as a suspected member of an Ohio Chapter of the PMC.

19.     Further, investigators also obtained information about associates of RANA's, who are not PMC members, including Anthony PELUSO, who was identified as a suspected cocaine and heroin drug trafficker.  Investigators also identified PELUSO's suspected drug customers, associates and sources of supply, including one of PELUSO's suspected heroin sources of supply, Jeffrey KUSHIK.  As will be detailed more fully below, investigators also intercepted KUSHIK's telephones, which led to identifying KUSHIK's suspected drug customers, associates and sources of supply, including Gary HAIRSTON and Darian WOFFORD.

20.     Law enforcement developed various confidential sources, directed a series of controlled buys, conducted physical and electronic surveillance of the targets of this investigation, seized quantities of controlled substances, obtained social media information; and, obtained authorization to intercept wire and electronic communications.

**B.     The Title III Wiretap Investigation**

21.     Beginning in and around August 2020, and continuing in and around November 2020, investigators obtained authorization to intercept ten (10) cellular telephones, utilized by six (6) individuals, as explained more fully herein: Eric ARMES, Bill RANA, Anthony PELUSO, Jeffrey KUSHIK, Gary HAIRSTON, and Darian WOFFORD.  In addition to the interception of wire and electronic communications, the Court also authorized investigators to obtain GPS/E911 location data for the cellular telephones intercepted.

22.     On August 4, 2020, a United States District Judge for the Western District of Pennsylvania authorized, at Misc. No. 20-1157, the initial interception of wire and electronic communications over TARGET TELEPHONE #1 (or TT1) (412-499-5531, used by Eric ARMES), TARGET TELEPHONE #2 (or TT2) (412-467-9304, used by Anthony PELUSO), and TARGET TELEPHONE #3 (or TT3) (412-712-3112) used by Bill RANA).   The authorization period for TT1, TT2, and TT3 expired on Thursday, September 3, 2020.

23.     On September 4, 2020, the same United States District Judge for the Western District of Pennsylvania authorized, at Misc. No. 20-1157(a), the interception of wire and electronic communications over TARGET TELEPHONE #1 (or TT1) (412-499-5531, used by Eric ARMES) and TARGET TELEPHONE #3 (or TT3) (412-712-3112), used by Bill RANA), as well as the initial interception of wire and electronic communications over TARGET TELEPHONE #4 (or TT4) (412-377-5614, used by Jeffrey KUSHIK), TARGET TELEPHONE #5 (or TT5) (412-509-7364, used by Anthony PELUSO), and TARGET TELEPHONE #6 (or TT6) (412-645-1281, used by Anthony PELUSO).  The authorization period for TT1, TT3, TT4, TT5, and TT6 expired on Saturday, October 3, 2020.

24.     On September 18, 2020, the same United States District Judge for the Western District of Pennsylvania authorized, at Misc. No. 20-1157(b), the initial interception of wire and electronic communications over TARGET TELEPHONE #7 (or TT7) (412-316-7963, used by Jeffrey KUSHIK).  The authorization period for TT7 expired on Saturday, October 17, 2020.

25.     On October 7, 2020, the same United States District Judge for the Western District of Pennsylvania authorized, at Misc. No. 20-1157(c), the continued interception of wire and electronic communications over TARGET TELEPHONE #3 (or TT3) (412-712-3112), used by Bill RANA), as well as the initial interception of wire and electronic communications over

TARGET TELEPHONE #8 (or TT8) (412-872-1395, used by Patrick RIZZO).   The authorization period for TT3 and TT8 expired on Thursday, November 5, 2020.   However, investigators ceased intercepting communications on TT8 prior to the expiration of the authorization period.

26.     On October 26, 2020, the same United States District Judge for the Western District of Pennsylvania authorized, at Misc. No. 20-1157(d), the initial interception of wire and electronic communications over TARGET TELEPHONE #7 (or TT7) (412-316-7963, used by Jeffrey KUSHIK),  the initial interception of wire and electronic communications over TARGET TELEPHONE #9 (or TT9) (412-808-4774, used by Gary HAIRSTON),  as well as the initial interception of wire and electronic communications over TARGET TELEPHONE #10 (or TT10) (412-944-3371, used by Darian WOFFORD).  The authorization period for TT7, TT9 and TT10 expired on Tuesday, November 24, 2020.   However, investigators ceased intercepting communications on TT9 and TT10 prior to the expiration of the authorization period.

27.     From August 4, 2020, the date of the first interception, to on or about November 24, 2020, law enforcement intercepted thousands of communications relating to drug trafficking. Throughout this Affidavit, whenever your Affiant refers to intercepted communications, those references relate to those authorized by one of the aforementioned Court Orders.[2]  Additionally, the examples identified herein are only a few of the intercepted communications, and the descriptions of the communications reflect your Affiant's interpretation and explanation of the

---

[2]    Throughout this Affidavit, your Affiant references intercepted telephone calls and text messages. The explanations of the meaning of those intercepted communications are based upon my training and experience and my involvement in this investigation, as well as upon other agents' training, experience, and involvement in this and other investigations.  The identification of the speakers in the communications referenced below is based in large part upon investigators' familiarity with the voices of each individual as developed and corroborated by contemporaneous surveillance observations, telephone number subscriber information, self-identification and other statements wherein the user of a telephone number reveals information identifying themselves as the user of the particular telephone numbers.

contents of the communications.   Your Affiant believes that these descriptions are accurate, although they may not be verbatim transcripts.

28.     The evidence obtained during the course of this investigation has revealed that the individuals identified herein and their conspirators are involved in distributing and/or conspiring to distribute or possess with intent to distribute large quantities of controlled substances in the Western District of Pennsylvania and elsewhere.

### C.     The Indictments

29.     On December 1, 2020, a federal grand jury sitting in Pittsburgh, Pennsylvania, returned three (3) related Indictments[3], at Criminal Nos. 20-377 (Bill Rana, et al.) (hereinafter

---

3.      The Indictment at Criminal No. 20-377 charges, at Count 1: From in and around January 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, BILL RANA, ERIC ARMES, CODY BONANNO, PHILLIP BONANNO and DOMINIC QUARTURE, did knowingly, intentionally, and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).  All in violation of Title 21, United States Code, Section 846; at Count 2: From in and around January 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, BILL RANA, JASON EVANS, HASANI JAMES, PHILLIP BONANNO and MARK STOCKHAUSEN, did knowingly, intentionally, and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii).  All in violation of Title 21, United States Code, Section 846; at Count 3: On or about October 21, 2020, in the Western District of Pennsylvania, the defendant, PATRICK RIZZO, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one (1) year, namely, Manufacturing, Delivering, Possession with Intent to Manufacture or Deliver a Controlled Substance, on or about August 5, 1994, at Docket Number CP-02-CR-2473-1994, in the Court of Common Pleas, County of Allegheny, Criminal Division, Commonwealth of Pennsylvania, knowingly possessed, in and affecting interstate commerce, a firearm, to wit: one (1) Black Taurus Judge .45 LC/410, bearing serial number LY499582.  In violation of Title 18, United States Code, Section 922(g)(1).

The Indictment at Criminal No. 20-375 charges, at Count 1: From in and around January 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, ANTHONY PELUSO, MARISSA BOTTA, DAVID PIETROPAOLO, THOMAS SNELSIRE, WAYNE WEBBER, RONALD SIMAK, ANTHONY SCATENA, JAMES STEWART, and DORIN DUNCAN, did knowingly, intentionally, and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii).  All in violation of Title 21, United States Code, Section 846; at Count 2 From in and around January 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, ANTHONY PELUSO, MARISSA BOTTA, and THOMAS SNELSIRE, did knowingly, intentionally, and unlawfully conspire with one another and

referred to as "Indictment No. 1"), 20-375 (Anthony Peluso, et al.) (hereinafter referred to as "Indictment No. 2"), and 20-374 (Jeffrey Kushik, et al.) (hereinafter referred to as "Indictment No. 3"), all of which remain under seal, charging thirty (30) individuals with committing drug trafficking and firearm offenses from in and around January 2020, through in and around November 2020.

30.     Among the thirty (30) individuals charged in the three (3) related Indictments are: Bill RANA, Jason EVANS, Patrick RIZZO, Anthony PELUSO, Jeffrey KUSHIK, Misty WALKER, Darian WOFFORD, Gary HAIRSTON, and Randy CAMACHO (collectively referred to as the "TARGET SUBJECTS").

31.     Federal arrest warrants were issued by this Court, for among others, the TARGET SUBJECTS, in conjunction with the return of the grand jury Indictments to this Court.  Arrests, however, have not yet been made, and all documents pertaining to these Indictments remain under seal.

---

with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).  All in violation of Title 21, United States Code, Section 846.

The Indictment at Criminal No. 20-374 charges, at Count 1: From in and around August 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, JEFFREY KUSHIK, GARY HAIRSTON, DARIAN WOFFORD, STEPHANIE ZILKA, MISTY WALKER, RANDY CAMACHO, SEAIRA COLLINS, and JESSICA TARANTO, did knowingly, intentionally, and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii).  All in violation of Title 21, United States Code, Section 846;  at Count 2:  From in and around August 2020, and continuing thereafter to in and around November 2020, in the Western District of Pennsylvania and elsewhere, the defendants, JEFFREY KUSHIK, GARY HAIRSTON, DARIAN WOFFORD, STEPHANIE ZILKA, MISTY WALKER, RICHARD WHITE, DAMIAN CHEREPKO, BRANDON HULBOY and JAMES CRIVELLA, did knowingly, intentionally, and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i).  All in violation of Title 21, United States Code, Section 846.

32.     As such, and as detailed further in this Affidavit, your Affiant believes that the SEARCH LOCATIONS identified herein continue to be utilized by the TARGET SUBJECTS in furtherance of the drug trafficking conspiracies in which the TARGET SUBJECTS are charged.

33.     It is, therefore, your Affiant's belief that evidence of the TARGET OFFENSES will be obtained at each SEARCH LOCATION as explained more fully herein.

**D.     The Search Locations**

**1)     SEARCH LOCATION 1: The PMC Pittsburgh Chapter Clubhouse**

34.     Based upon this investigation, including intercepted communications, as well as physical and electronic surveillance, your Affiant is aware that Bill RANA, Eric ARMES, Patrick RIZZO, and other PMC members and/or associates often meet at SEARCH LOCATION 1 – that is, the PMC Pittsburgh Chapter Clubhouse, which is located at 156 Nichol Avenue, McKees Rocks, PA 15136 (also listed as 156 Ohio Street, McKees Rocks, PA 15136 and 154 Ohio Street, McKees Rocks, PA 15136).

35.     In addition to intercepted communications, investigators also obtained a federal search warrant for RANA's Facebook.  A review of the contents of RANA's Facebook confirms RANA's role within the PMC – that is, RANA self-identifies as the "pa Sargent", the "Sargent Arms for pagans" and:

> **Author**  Bill Rana (Facebook: 100003904850024)
> **Sent**  2020-01-22 21:07:45 UTC
> **Body**  Hey how are you this is pgh billy 1% pagan

Your Affiant is aware that the term "one percenters" was coined in approximately 1947 when the American Motorcycle Association made a statement after a motorcycle rally in Hollister, California, that claimed that 99% of the rally attendees (motorcyclists) were law abiding citizens; but, that the other one (1) percent of attendees, who caused an array of issues at the rally, were

outlaws.  Since then, "1%" stitched in a diamond shaped patch has become a common patch found on the "cuts" (i.e. a denim jacket with the sleeves cut off) worn by a member of an outlaw motorcycle gang, including some members of the PMC.

36.    Your Affiant is aware that RANA not only wears the 1% diamond shaped patch on his "cuts" but also has a tattoo of the 1% diamond shaped patch on his face.



37.    Further, your Affiant is aware, based upon this investigation, including intercepted communications and Facebook communications, that PMC parties, which are often held at SEARCH LOCATION 1, involve, among other things, "party favors," which your Affiant is aware is a term used to describe various hard drugs, such as methamphetamine, ecstasy and other "club drugs," and that these parties also involve prostitution.

38.     Investigators also obtained search warrants for GPS/E911 location data for cell phones operated by ARMES, RANA and RIZZO, which revealed that the cellular telephones for each individual were often located within the vicinity of SEARCH LOCATION 1.

39.     Investigators placed a pole camera within the vicinity of SEARCH LOCATION 1 and a review of the pole camera footage, from in or around February 2020 through November 2020, confirmed that the PMC Pittsburgh Chapter members routinely hold "church", a term used to describe the PMC's weekly meetings, on Thursdays, and also appeared to hold frequent, large gatherings or parties between PMC members/associates, non-PMC members, and other outlaw motorcycle gangs, at SEARCH LOCATION 1.

40.     Further, intercepted communications over TT1, TT3 and TT8 revealed that these meetings were often used to facilitate their illegal drug and firearms trafficking, among other illegal activity.

41.     Several suspected members of the PMC, including RANA, ARMES, EVANS, RIZZO and P. BONANNO have been charged with violations of Title 21, U.S.C. § 846, conspiring to possess with intent to distribute controlled substances, as detailed more fully herein and incorporated by reference.

    2)     **SEARCH LOCATION 2: 25 Deerton Road, Cheswick, PA 15024 (Bill RANA)**

42.     As set forth more fully above, RANA has been charged in Indictment No. 1, with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance (Count One) and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count Two), both in violation of 21 U.S.C. § 846.

43.     As detailed herein, through this investigation RANA has been identified as holding a leadership position within the PMC Pittsburgh Chapter and is a suspected cocaine, methamphetamine, and marijuana trafficker.

44.     Investigators obtained authorization to intercept, among others, a telephone operated by RANA, TT3, as detailed more fully above and herein.

45.     During numerous wire and electronic intercepted communications, over TT3, RANA identifies his residence as 25 Deerton Road, Cheswick, PA 15024 (SEARCH LOCATION 2).

46.     Further, intercepted communications, confirm that several members of the conspiracy, including EVANS, ARMES, C. BONANNO, and P. BONANNO, meet at SEARCH LOCATION 2 (RANA's residence) to facilitate their illegal activity.

47.     For example, in August of 2020, based upon intercepted communications, ARMES arranged to conduct a drug transaction, on behalf of RANA, at RANA's residence with C. BONANNO and P. BONANNO.  ARMES, over TT1, spoke to both BONANNOS as well as RANA.  In conjunction with intercepted communications, investigators conducting surveillance in the vicinity of SEARCH LOCATION 2 observed C. BONANNO driving a vehicle registered to him and P. BONANNO driving a motorcycle, while wearing his Pagans "cuts", arrive at SEARCH LOCATION 2.  Your Affiant believes that during this visit, RANA and ARMES obtained methamphetamine from the BONANNOS.

48.     Additionally, your Affiant believes, based upon this investigation, including intercepted communications, that RANA, who has a prior felony drug conviction in the United States District Court for Western District of Pennsylvania at Crim. No. 08-CR-69, illegally possesses firearms and ammunition, which he stores at SEARCH LOCATION 2.

49.     For example, on September 5, 2020, at approximately 8:31 PM, RANA (BR) places an outgoing call, over TT3, to his suspected girlfriend (GF), who your Affiant is aware also resides at SEARCH LOCATION 2, and asks her, "[w]here, where the f***4 did you hide all the g******n things for the gun" and then clarifies, "where the bullets at?"  In response, GF informs RANA that she placed the bullets behind the TV.  RANA clarifies whether she means the monitors and not the TV, to which GF confirms.

50.     Further, investigators obtained information, via law enforcement databases that RANA currently resides at SEARCH LOCATION 2.  For instance, SEARCH LOCATION 2's address is the address of the residence listed on RANA's current Pennsylvania driver's license, which was issued on April 28, 2020, and is set to expire on July 24, 2023.

51.     Additionally, from August 2020 through November 2020, analysis of court authorized GPS/E911 location data obtained, in conjunction with electronic and wire intercepts over TT3, revealed that TT3 was frequently located overnight in the area of SEARCH LOCATION 2.  On November 23, 2020, the Honorable Lisa Pupo Lenihan, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2373, authorized a search warrant for the disclosure of GPS/E911 location data for TT3, from Sprint/T-Mobile.  The GPS/E911 location data relating to this telephone number, utilized by RANA, revealed TT3 continues to be located in the vicinity of SEARCH LOCATION 2.

   **3.     SEARCH LOCATION 3: 124 Earl Street, Pittsburgh, PA 15204
           (Jason EVANS)**

52.     As set forth more fully above, EVANS has been charged in Indictment No. 1 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and

---

         4.     Asterisks (*) do not appear in the original communications/text.

substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (Count Two).

53.     Based upon this investigation, including intercepted communications over TT1 (ARMES) and TT3 (RANA), wherein EVANS was intercepted, EVANS has been identified as a close associate of, among others, Bill RANA, Eric ARMES, and Phillip BONNANO.

54.     Additionally, EVANS has been identified as a suspected member of the PMC Pittsburgh Chapter and actively engaged in distributing cocaine with RANA.

55.     For example, on September 22, 2020, RANA, over TT3, communicated with Phillip BONNANO (P. BONANNO), who requested to obtain cocaine from RANA, and inquired where he (P. BONNANO) could meet RANA.  After communicating with EVANS, who provided RANA, over TT3, with his (EVANS) address as "l24 Earl St.", RANA advises P. BONNANO that he should go to 124 Earl Street to obtain the cocaine.  P. BONNANO then informs RANA that he (P. BONNANO) is halfway to his residence in Ohio and is going to switch vehicles - that is, from his bike to his Cadillac – and will then go to 124 Earl Street. RANA tells P. BONNANO that he (RANA) will send P. BONNANO a telephone number to call when he (P. BONNANO) is traveling to 124 Earl Street.  RANA, over TT3, subsequently sends an outgoing text message, as follows: "(472) 860-9478 Shahid". Your Affiant is aware, based upon this investigation, that this telephone number is associated with EVANS and that EVANS' street name is "Shahid".

56.     On September 17, 2020, law enforcement conducted surveillance in the vicinity of SEARCH LOCATION 3.   Law enforcement observed EVANS exit the front door of SEARCH LOCATION 3, carrying a black backpack.  EVANS proceeded to enter a blue Ford Mustang, bearing PA registration LGC4960, and departed the area.  Searches of law enforcement

data bases revealed that the blue Ford Mustang, bearing PA registration LGC4960, is registered to Jason EVANS, 25 Deerton Street, Cheswick, PA 15024.  This investigation has revealed that 25 Deerton Road, Cheswick, PA 15024, is Bill RANA's residence (SEARCH LOCATION 2) and that EVANS previously resided, with RANA, at SEARCH LOCATION 2.

57.     Searches of the law enforcement database, CLEAR, revealed that SEARCH LOCATION 3's address, 124 Earl Street, Pittsburgh, PA 15204, was associated with a credit check under EVANS' name as of September 23, 2020.

58.     On October 22, 2020, the Honorable Patricia L. Dodge, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-1842(a), authorized a search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by EVANS, (412) 860-9478, from Verizon.  As of November 2020, the GPS/E911 location data relating to this telephone number, utilized by EVANS, revealed locations frequented by EVANS, including: the vicinity of SEARCH LOCATION 3.

**4.     SEARCH LOCATION 4: 308 Campbell Street, Apartment B, McKees Rocks, PA 15136 (Patrick RIZZO)**

59.     As set forth more fully above, RIZZO has been charged in Indictment No. 1 with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Three).

60.     Investigators obtained authorization to intercept, among others, a telephone operated by RIZZO, TT8, as detailed more fully above and herein.

61.     Based upon this investigation, including intercepted communications, your Affiant believes that RIZZO is a senior member of the PMC Pittsburgh Chapter and involved in firearms trafficking as well as cocaine, methamphetamine, ecstasy, heroin, and marijuana trafficking.

62.     For example, on November 3, 2020, between 2:15 PM and 2:19 PM, RIZZO

(PR), utilizing (412) 540-0083, received an incoming call from RANA (BR), over TT3.   The

below is a transcription of the pertinent portion of the call:

| | |
|---|---|
| PR: | When you get a second can you text me his number? |
| BR: | Shahid's? |
| PR: | Yeah, cause I don't know why it ain't in my phone, like, I had his number and then it's not, I don't know why. It must be the phone that broke or the one I lost or the one I broke that must be the last phone it was in and it didn't transfer over |
| BR: | He was in Miami |
| PR: | What's that? |
| BR: | He just got back from Miami |
| PR: | Well good cause I need to talk to him while he's in town. But uhh, you all good? |
| BR: | So you want his number? |
| PR: | Yeah yeah yeah, you just gonna tell it to me? |
| BR: | Yeah |
| PR: | Hold on let me get a umm, there should be a pen right here in the truck. Me and f***in Scrapes are out here workin on one of Darin's steel buildings, them Mexicans butchered the f*** out of this building dude |
| BR: | I just texted it to you bro |
| PR: | What's that? |
| BR: | I just texted it to you |
| PR: | Oh you just did? |
| BR: | Mhmm |
| PR: | Alright cool, the 860 number? |
| BR: | What? |
| PR: | The 412-860? |
| BR: | Yep |
| PR: | Alright cool, thanks |

63.     Based on your Affiant's training and experience, and your Affiant's knowledge

from this investigation, during the above-referenced conversation, RIZZO is asking RANA for

Jason EVANS' telephone number. Your Affiant is aware that EVANS, described above, is a

cocaine trafficker. RIZZO indicates that he had EVANS' telephone number saved in one of his

phones but that it must have been saved in a phone that RIZZO had previously lost or the one

that was previously broken. RANA informs RIZZO that EVANS has just returned to town from

Miami. RIZZO indicates to RANA that he needs EVANS' telephone number in order to set up

an in person meeting to discuss a potential cocaine transaction with EVANS now that he is back in town. RANA reiterates that RIZZO is asking for EVANS telephone number. RIZZO affirms and asks if RANA is going to read it to him over the phone. RANA agrees. RIZZO advises RANA to give him a minute to find something to write with and informs RANA of the building that he is currently working on and the quality of work being done on the building by other workers. RANA informs RIZZO that he just sent RIZZO a text message containing Jason EVAN's telephone number. RIZZO inquires as to which number RANA sent. RANA confirms that he sent the correct number for EVANS.  RIZZO thanks RANA and the call ends.

64.     Additionally, your Affiant is also aware that RIZZO frequently discussed the type and/or quality of "weed" or marijuana that he (RIZZO) had for sale and also discusses his drug debt, explaining to several individuals that money is very tight and he needs to sell his current supply of marijuana.

65.     According to subpoena returns from T-Mobile, TT8 is a T-MOBILE telephone with the telephone number (412) 872-1395, IMSI number 310260054464026, and is subscribed to PATRICK JASON RIZZO, 308 Campbell ST APT B, McKees Rocks, PA 15136-2728 – that is, SEARCH LOCATION 4.  This IMSI was activated on August 13, 2020.

66.     Searches of the law enforcement database, CLEAR, revealed that SEARCH LOCATION 4 was also associated with a credit check under RIZZO's name as of October 3, 2019.

67.     Analysis of court authorized GPS/E911 location data in conjunction with electronic and wire intercepts over TT8 revealed that in October 2020, TT8 was frequently located overnight in the area of SEARCH LOCATION 4.

68.     Further, SEARCH LOCATION 4's address is the address of the residence listed on RIZZO's current Pennsylvania driver's license, which was issued on January 5, 2018, and is set to expire on January 31, 2021.

### 5.     SEARCH LOCATION 5: 2780 Hunters Circle, Apartment 421, (Anthony PELUSO)

69.     As set forth more fully above, PELUSO has been charged in Indictment No. 2 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One), and 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance (Count Two), all in violation of 21 U.S.C. § 846.

70.     Investigators obtained authorization to intercept, among others, three (3) telephones operated by PELUSO, TT2, TT5 and TT6, as detailed more fully above and herein.

71.     Based upon this investigation, including intercepted communications over among others, TT2, TT5, and TT6, Anthony PELUSO has been identified as a close associate of Bill RANA and Jeffrey KUSHIK and a cocaine and heroin trafficker.

72.     The investigation has revealed that, among other individuals, PELUSO obtains cocaine from RANA and obtains heroin from KUSHIK.

73.     During the pendency of this investigation, from January of 2020 through November 2020, PELUSO was observed on numerous occasions by law enforcement, conducting surveillance, engaging in what appeared to be drug transactions in the parking lot of SEARCH LOCATION 5.

74.    For example, law enforcement conducted a total of eight (8) controlled purchases of cocaine from PELUSO with each drug transaction occurring in the parking lot of SEARCH LOCATION 5.[5]

75.    During the course of the Title III investigation, PELUSO, via intercepted communications, often directed drug customers to meet him or his girlfriend, Marissa BOTTA, who is also charged in Counts One and Two of the Indictment No. 2, at SEARCH LOCATION 5 to conduct the drug transaction.

76.    Additionally, your Affiant is aware that in September 2020, PELUSO broke his ankle, which required him to stay in the hospital for a period of time.  While he was in the hospital, PELUSO directed his drug customers to meet BOTTA at, among other places, SEARCH LOCATION 5.

77.    For instance, on September 17, 2020, PELUSO via, TT5, and Anthony SCATENA, also charged in Indictment No. 2, exchanged a series of text messages and telephone calls to facilitate SCATENA obtaining "10.5" grams of cocaine for $750 from BOTTA at SEARCH LOCATION 5.  During these communications, PELUSO tells SCATENA to "ring the doorbell" to which SCATENA asks, "Bro how do I like? Which one is it bro I dont know." PELUSO responds, "421 cuz. How you don't know which one it is you been comin there for two

---

5.    A "controlled drug purchase" or "controlled purchase" is a purchase of a controlled substance by a CS or undercover officer (UC) under the direct control and supervision of an investigating officer(s).  If a CS is utilized, the CS is searched for drugs and currency prior to the purchase.  His/her vehicle (if it is to be utilized) is also searched for drugs and currency prior to the purchase.  The CS/UC is followed to and from the point of purchase and visual contact is attempted to be maintained at all times, except when he/she has actually entered any structure where the purchase is to take place.  After the purchase, the CS/UC is followed back to a predetermined location where the drugs are relinquished to the investigating officer(s) and the CS, and any vehicle utilized by the CS, is again searched.  Any controlled substances are then collected and stored as evidence, pursuant to proper procedures.  To help protect the identity of the CS and others due to the violent nature of the defendants, and their associates, the precise dates, times, amounts, and discussions have not been included.  Nevertheless, based upon information provided to me from other agents/officers, who had prior conversations with the CS, and based upon the fact that information provided by the CS was corroborated through other law enforcement means, I believe that the information provided by the CS, used in conjunction with the controlled buys, as described herein, relative to the instant investigation, is reliable.

years. 421 cuz."  Your Affiant is aware that PELUSO and BOTTA live in apartment "421".

Subsequent communications reveal that BOTTA was inside of the apartment obtaining the

requested cocaine – that is BOTTA was "puttin it on the scale whenever I was talkin to you."

SCATENA then informs PELUSO that he is waiting in PELUSO's living room for BOTTA.

PELUSO instructs SCATENA on where BOTTA is within the apartment and during this

intercepted call PELUSO requests to speak to BOTTA and does.

78.     Further, investigators obtained information, via law enforcement databases that

PELUSO currently resides at SEARCH LOCATION 5.  For example, SEARCH LOCATION 5's

address is the address of the residence listed on PELUSO's current Pennsylvania state

identification card, which was issued on April 5, 2019, and is set to expire on November 30,

2021.

79.     Analysis of court authorized GPS/E911 location data in conjunction with

electronic and wire intercepts over TT2, TT5 and TT6 revealed that from approximately August

2020 through October 2020, TT2, TT5, and TT6 were frequently located overnight in the area of

SEARCH LOCATION 5.

80.     On November 13, 2020, the Honorable Lisa Pupo Lenihan, United States

Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2281, authorized a

search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by

PELUSO, (412) 645-1281, from Verizon.  As of December 2020, the GPS/E911 location data

relating to this telephone number, utilized by PELUSO, revealed locations frequented by

PELUSO, including: the vicinity of SEARCH LOCATION 5.

6.    **SEARCH LOCATION 6: 150 Southern Avenue, Pittsburgh, PA, (Jeffrey KUSHIK)**

81.    As set forth more fully above, KUSHIK has been charged in Indictment No. 3 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One) and conspiring to distribute and possess with intent to distribute 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance (Count Two), all in violation of 21 U.S.C. § 846.

82.    Investigators obtained authorization to intercept, among others, two (2) telephones operated by KUSHIK, TT4 and TT7, as detailed more fully above and herein.

83.    Based upon this investigation, including intercepted communications, Jeffrey KUSHIK has been identified as a suspected large-scale cocaine and heroin trafficker in the Greater Pittsburgh Area.

84.    Numerous intercepted communications revealed that KUSHIK often directed drug customers to meet him in the vicinity of SEARCH LOCATION 6, including in the alleyway behind his residence.  Your Affiant is aware that the rear of SEARCH LOCATION 6 faces a one-way street/alley that runs parallel to SEARCH LOCATION 6.

85.    On September 21, 2020, through the use of the contemporaneous wiretap interceptions, occurring over TT7, from approximately 2:30 to 3:00 PM investigators conducted surveillance in the vicinity of SEARCH LOCATION 6.

86.    Investigators intercepted an incoming call between KUSHIK and CAMACHO, using 412-760-4520, wherein the two (2) discuss meeting at KUSHIK's residence to conduct a drug transaction.  KUSHICK informs CAMACHO that he (CAMACHO) can come to his residence "but they have to chill on the back porch because his step son is doing virtual learning

on the laptop in the house and they can't be doing that in front of the camera."  Your Affiant is aware that there were several intercepted communications earlier in the day wherein KUSHICK and CAMACHO discuss conducting a drug transaction.  CAMACHO also identifies himself, during this call, as driving a "Benz", which is a reference to a Mercedes Benz.  Investigators observed a burgundy Mercedes Benz sedan, bearing PA registration LJT 5706, parked in the alley-way behind KUSHIK's residence.  A search of law enforcement databases revealed that the burgundy Mercedes Benz, which had a temporary license plate, returned no registered owner or address.   Investigators also observed KUSHIK and CAMACHO, based upon his NCIC photograph, standing outside of KUSHIK's residence talking.  Shortly thereafter, investigators observed the burgundy Mercedes Benz, with the temporary license plate, leave the area, and CAMACHO was observed as the driver and sole occupant of the vehicle.

87.     Shortly thereafter, investigators observed a white Range Rover SUV, bearing PA registration KYL 1558, park in front of KUSHIK's residence.  KUSHIK was observed entering the passenger side of the SUV and the driver of the vehicle was identified as BOTTA.  Shortly after KUSHIK enters the vehicle, the vehicle is observed leaving the area.    Your Affiant is aware, from earlier intercepted communications, that BOTTA was meeting with KUSHIK to obtain a resupply of heroin from KUSHIK for BOTTA and PELUSO to sell.

88.     Additionally, searches of the law enforcement database, CLEAR, revealed that the address associated with SEARCH LOCATION 6 was associated with a credit report under KUSHIK's name as of July 14, 2020.  Further, in December 2020, Pennsylvania State Parole Officers informed investigators, including your Affiant, that KUSHIK listed his current address with the Parole Office as the address associated with SEARCH LOCATION 6.

89.     On November 23, 2020, the Honorable Lisa Pupo Lenihan, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2378, authorized a search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by KUSHIK, (412) 377-5614, from AT&T.  As of December 2020, the GPS/E911 location data relating to this telephone number, utilized by KUSHIK, revealed locations frequented by KUSHIK, including: the vicinity of SEARCH LOCATION 6.

      7.     **SEARCH LOCATION 7: 3006 Shadeland Avenue, Unit #2, Pittsburgh, PA 15212 (Misty WALKER)**

            **AND**

      8.     **SEARCH LOCATION 8: Unit Number 3112, Extra Space Storage, 880 Saw Mill Run Boulevard, Pittsburgh, PA 15226 (Misty WALKER)**

90.     As set forth more fully above, WALKER has been charged in Indictment No. 3 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One) and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance (Count Two), all in violation of 21 U.S.C. § 846.

91.     Investigators obtained authorization to intercept, among others, two (2) telephones operated by KUSHIK, TT4 and TT7, as detailed more fully above and herein.

92.     WALKER was intercepted over KUSHIK's telephones and, based upon this investigation, including intercepted communications, WALKER has been identified as KUSHIK's sister and one of KUSHIK's close associates in his drug trafficking operation. Specifically, this investigation has revealed that WALKER maintains and safeguards KUSHIK's drug supply or "stash" at her residence, which is located at SEARCH LOCATION 7, and that

she also has leased a storage unit, on behalf of KUHIK, which is located at SEARCH LOCATION 8.

93.     Based upon intercepted communications and physical surveillance, WALKER routinely communicated with KUSHIK regarding KUSHIK's drug trafficking activities involving WALKER's residence at SEARCH LOCATION 7.  For example, on one occasion, KUSHIK advised WALKER that he was on the way to her residence to pick up controlled substances and requests that she obtain the specified amount for him – that is an "ounce", which your Affiant is aware is a reference to 28 grams of cocaine.

94.     Investigators, conducting surveillance, observed KUSHIK, on several occasions, entering and exiting SEARCH LOCATION 7 in conjunction with drug facilitation communications intercepted over TT4 and TT7.  Based upon your Affiant's training and experience, your Affiant knows it is common for individuals involved in drug trafficking to meet drug customers in close proximity to their drug stash locations, but not at stash locations.  This is done to prevent the identification of their residence by law enforcement and/or potential law enforcement actions.

95.     For example, on September 22, 2020, through the use of the contemporaneous wiretap interceptions occurring over TT7, from approximately 4:45 PM to 6:00 PM, investigators conducted surveillance in the vicinity of SEARCH LOCATION 5.  Investigators observed KUSHIK exit the residence and enter the passenger side of a white KIA SUV, bearing PA registration JMD 8771, that had previously driven up to and pulled in front of the residence. A search of law enforcement databases revealed that this vehicle is registered to Damian George CHEREPKO, who is also charged in Indictment No. 3, and a female.  Shortly thereafter,

investigators observed the white KIA, leave the residence, turn onto Casemont Street from Shadeland Avenue, and proceed to exit the viewing area of investigators.

96.     Additionally, on September 30, 2020, at approximately 4:12 PM, HAIRSTON (GH), utilizing **TT9**, placed an outgoing call to KUSHIK (JK), over **TT7**, at approximately 4:55 PM JK places an outgoing call to GH and at approximately 5:11 PM GH places an outgoing call to JK:

| | |
|---|---|
| JK: | Yo yo |
| GH: | What up/ |
| JK: | What up wit it? |
| GH: | You comin over to the north today? |
| JK: | I'm actually about to be over there. This is good timing |
| GH: | Alright. Hit me when you get over there. I need like 10 minutes and I'ma come meet you I need to see you. |
| JK: | Aight, aight my man |
| GH: | Aight bye |
| GH: | Yo |
| JK: | Yo, I'm over here. I'm waitin for this last move to get here that will be here in like 5-10 minutes, probably like 10 minutes [voices overlap]. |
| GH: | Aight well call me I'll meet you down by Hanini's I'm gonna get me a sandwich |
| JK: | Yeah that's what I'm sayin [voices overlap] |
| GH: | I'm f***in starvin |
| JK: | In 10 minutes I'ma go to Hanini's and get a sandwich so I'm call you as soon as I get there. |
| GH: | Hey call me because I gotta stop at my son's and get my pick up truck so if you get there before me I want you to order my sandwich so call me when you get there. |
| JK: | Aight, my man. |
| GH: | Aight. |
| JK: | I'm pullin up to Hanini's in three minutes |
| GH: | Daayuuum...Alright I'm gonna wait on you |
| JK: | I'm literally on Shadeland, like, I'm not even three minutes bro, I'll be there in two minutes, not even. |
| GH: | Aight |
| JK: | I'm literally on Shadeland |
| GH: | Aight |
| GH: | Yo |
| JK: | I see you |

97.     Based on your Affiant's training and experience, and your Affiant's knowledge from this investigation, during the above-referenced conversation, HAIRSTON asks KUSHIK if he (KUSHIK) is going to be in the "north" today, which is a reference to the northside of Pittsburgh.  KUSHIK responds that he is on his way there now.  HAIRSTON requests that KUSHIK contact him (HAIRSTON) when he arrives but will need approximately ten (10) minutes before he (HAIRSTON) can meet KUSHIK.  KUSHIK contacts HAIRSTON to inform him that he (KUSHIK) is waiting to meet with his "last move," which is a reference to another drug transaction, and will then meet HAIRSTON at "Hanini's," which is a reference to Hanini's Market and Subs located at 3245 Brighton Rd, Pittsburgh, PA 15212, in ten (10) minutes. HAIRSTON informs KUSHIK that he is going to obtain his son's pickup truck and will then meet KUSHIK.  HAIRSTON tells KUSHIK that if KUSHIK arrives at Hanini's Market before HAIRSTON, KUSHIK should call him (HAIRSTON) so that KUSHIK can order him (HAIRSTON) a sandwich.  KUSHIK then calls HAIRSTON and informs HAIRSTON that he is approximately three (3) minutes from Hanini's.  HAIRSTON advises KUSHIK that he is not sure if he (HAIRSTON) wants to wait on KUSHIK.  KUSHIK informs HAIRSTON that he (KUSHIK) is on Shadeland, which your Affiant is aware is the street name where WALKER (KUSHIK's sister) resides and where investigators, including your Affiant, believe KUSHIK stores his drug supply.  HAIRSTON affirms.  HAIRSTON tells KUSHIK that he (HAIRSTON) sees KUSHIK.

98.     In addition, on October 17, 2020, at approximately 6:32 PM, KUSHIK (JK) places an outgoing call over **TT7**, from WALKER (MW), who was using the telephone number (412) 568-8387:

MW:   Hello?
JK:    Sis?

MW:   What's up?
JK:   I need you to do me a favor
MW:   What?
JK:   I need you to go into the, into the thing….
MW:   Uh huh.
JK:   And crack 'em a little bit and see how many are purple.
MW:   What are you talkina bout? The things?
JK:   Yeah Misty, which ones are - see how many are purple and see how many are blue.
MW:   Well I would have to open them all.
JK:   You should just crack like a wee little piece off the top and see you shouldn't have to open them all the way.
MW:   Alright, you're gonna have to give me a couple seconds because I got Queenston with me So.
JK:   You got what?
MW:   I got King.
JK:   Oh alright, tell my nephew I said what's up.
MW:   [Aside: Uncle Jeff said what's up. He's talking to you King. Oh my bad.] Did you hear him? He said I like my nickname as queen [laughs] [Aside: Oh my bad my bad] Ray gave him that nickname so it has to be what he gave him, Queenie [laughs] Alright yeah I'm pulling up now to the house so let me get him on his phone and I should be able to do that okay?
JK:   Alright.
MW:   Without f***in it up, okay? [laughs]
JK:   Alright I love you
MW:   Alright I love you, buh bye

99.   Based on your Affiant's training and experience, and your Affiant's knowledge from this investigation, during the above-referenced conversation KUSHIK and WALKER greet and KUSHIK refers to WALKER as his sister.  KUSHIK instructs WALKER to go into the supply of heroin that WALKER is storing for KUSHIK at her residence.  KUSHIK instructs WALKER to open the outer packaging that the heroin is wrapped in and determine the amount of heroin that has a purple marking on them.  WALKER asks KUSHIK to confirm that he (KUSHIK) is talking about the supply of heroin that WALKER is storing for KUSHIK. KUSHIK affirms and refers to WALKER as "MISTY."  KUSHIK instructs WALKER that he wants her to determine the amount of heroin that has a purple marking on them as well as determine the amount of heroin that has a blue marking on them.  WALKER advises KUSHIK

that she would need to unwrap the outer packaging of all the heroin to determine, which are marked purple and which are marked blue. KUSHIK tells WALKER she will only need to open a small portion of the outer wrapping that the heroin is packaged in to fulfill KUSHIK's request. WALKER affirms and asks KUSHIK to give her some time because she has her juvenile son with her (KUSHIK's nephew). KUSHIK and WALKER discuss KUSHIK's nephew. WALKER tells KUSHIK that she will examine the heroin supply for KUSHIK after she is able to occupy KUSHIK's nephew. KUSHIK affirms. WALKER jokingly advises KUSHIK that she will not make a mistake. KUSHIK and WALKER tell each other they love each other.

100. Searches of the law enforcement database, CLEAR, revealed that SEARCH LOCATION 7, 3006 Shadeland Ave, Unit #2, Pittsburgh, PA 15212, was associated with a credit check under WALKER's name as of April 30, 2020.

101. Interceptions over TT2, TT4, and TT7, have confirmed that KUSHIK and PELUSO are highly sensitive to law enforcement scrutiny, particularly around their residences. Additionally, PELUSO and KUSHIK were intercepted discussing their use of video surveillance at their residences in an attempt to identify law enforcement presence or surveillance as well as the use of multiple storage facilities.

102. Moreover, based upon intercepted communications between KUSHIK and PELUSO, it appears that both KUSHIK and PELUSO keep the proceeds of their illegal drug trafficking in storage lockers/units and not in financial institutions.

103. For example, on August 5, 2020, at approximately 11:57 PM, PELUSO (AP), received an incoming call, over TT2, from KUSHIK (JK), who was utilizing TT4:

. . .

JK:     L-listen dog, I'm telling you right now, that bitch that got pulled over coming out of your crib she told on you bro. If them n****s didn't kick in your door already

41

|      | or have her make a buy off you or someone else make a buy off you already they're going to. They're gonna try bro, you ain't bullet proof out there. I don't want to be involved in that shit bro. |
|------|---|
| AP:  | Yeah I already know cuz I ain't doing nothing with that, I-I'm no I ain't I-I'm not slow cuz. |
| JK:  | [Coughing] I hope immediately after that you made sure everything was outta your house, I hope that you don't have anything in there now bro. |
| AP:  | Yeah. |
| JK:  | [Mumble] I'm telling ya dog, like take it from me bro, like I might, may, max will have like a nickel, a nickel in my crib, I mean there's times, don't get it twisted, there's times I might ya know had be like have nice book bag here but it's it's not here long bro, believe that. |
| AP:  | Ain't no doubt man. |
| JK:  | So, so [voices overlap] [coughing] Don't shit where you sleep dog, just saying. |
| AP:  | I know, I definitely know. |
| JK:  | Ya mean even them units bro there 24 dollars a month bro. I got f***ing five of em now, like. |
| AP:  | Yeah. |
| JK:  | It's just, I don't know dog. Just.. |
| AP:  | Yeah. I told you bout them, didn't I tell you about them when you first came home? |
| JK:  | Yeah you did. |
| AP:  | Yeah. Cause you didn't know what to do I told you man do this. Yeah. I-I already know I'm already up on that, I already [voices overlap] |
| JK:  | [Talks over AP] I took I took it to another level n**** I got multiple,multiples all in different folks names dat way like even if I gotta run in an out like I can go to this one and then Ican go to that one, and then I can this one and then you know what I mean, and then I got, I got one one super far away that the just the fettacini alfredo you know what I mean. That [voices overlap] |
| AP:  | Yeah. |
| JK:  | Hardly ever go to, just go there to put something up and that's it. |
| AP:  | Yeah. |
| JK:  | [Coughing] you know what I'm saying because how cheap they are bro its' just that shits nothing. |
| AP:  | Yeah well straight, hell yeah cuz, definitely. We got a one right across the street from me too. |
| JK:  | I mean I wouldn't do not a -not a thing out there man |
| AP:  | [laughs] |

. . .

| JK:  | Well, soon as you link up with shorty make sure you hit me. |
|------|---|
| AP:  | Ain't no doubt, I got you. |
| JK:  | Alright. Hey yo what's up, what's up with Christina though? |
| AP:  | That's what I'm talking about. |
| JK:  | No, I wasn't talking about Crystal [voices overlap] |

AP:     [laughs] Oh, Oh yeah [laughs]

JK:     I was talking about Christinaaa.

AP:     Still the same thing, what you mean? Still the same thing.

JK:     Oh, she's there?

AP:     Not right here, but it's like,like how I gave it to you the last time.

JK:     And what's the ticket?

AP:     Shh-17.

JK:     Stop that.

AP:     Swear to God.

JK:     I believe, I believe you 15.

AP:      I swear to god. Ask my girl she ain't gonna lie to you and they only had, like, and I was only able to get 5. Like, it - sometimes I be able to get 7, 9. Sometime it's 5, but its' f***in – I charge 500 a quarter cuz and make 300 off a joint. I make enough to pay my bills and f***in, hopefully dude keeps coming through, but sometimes this n**** won't come through for weeks and weeks and weeks. So it's like [voices overlap]

JK:     I can't wait until one of one of my homies tell me like, "Yeah," they're like, "I bumped into my homie - I was with my homie today and he had" [voices overlap]

AP:     I know, me neither n****! I been trying to tell you cuz!

JK:     Well I bumped into my homie today and he had an eiffy on him, but it was bunk. Like it was [voices overlap]

AP:     That's what, that's what it's like everywhere its like that cuz. everywhere its like that cuz.

JK:     Yeah.

AP:     It's like that. Everyone that used to have like the fire got straight crazy re now because thats how it is right now bro.

JK:     Listen though bro but I still haven't bumped in to anyone I need to bro and I just gave up on it because I been over there, but I guess cause of this corona shit motherf***ers ain't out and about.

AP:     Yeah that's why it's f***ed up.

JK:     Naw, I'm talking like bro, like I know they got it dog cause motherf***ers still got hard. Bro motherf***ers still got hard all over the North. You can grab hard whenever you want on the North. So I know, I know they have it bro. I just, I-- they're not at their usual spots bro, so, like, if I can bump into my man "Ko'" or "J-Dub" like bro I'm telling you it'll be or even "Peepers" or "Baby P-mac" like I'm telling you like, like that shit'll be there dog. It's just I can't bump into em, I'm ready to drive up North Charles or Sheffield Street like, but, Alright I'm holla though.

AP:     Aight. My man never let me down and he said the same thing, like, the pandemic. He said it f***ed up everybody until they open up them borders and that's f***ed up cuz.

JK:     Man that shit's opened up, that shit up.

AP:     Naw the borders ain't open they still got travel restrictions cuz. You can't just go out the country and all that. That shit's shut down cuz till like the end of September or some shit they said.

JK:     So you mean to tell me that -- you mean to tell me that these n****s just-- they're, these motherf***ers just had that much boy laying around. I was telling my girl like I like I think it's possible and that's why I think that joints aren't as good as they usually are, because you can stretch the f*** outta D, like, the motherf***ers brining it into the city that got like straight chickens of raw D like, like ,bro you can stretch.

AP:     No doubt. Especially if you got the right shit, you can f***ing put f***ing 6-7 on 1 and it'll still be cool cuz.

JK:     That's what I was thinkin.

AP:     Yeah if you got like the tranqs and all that shit that won't kill it, it'll still be --you can be f***ing right cuz.

JK:     That's the only thing I can think of bro and like that online bullshit like that white shit that everyone puts in there now.

AP:     Yeah. That's like, I be trying to like, it's some of that shit like, I'm a online master bro, but it' s been like so hard to find that car and that [voices overlap]

JK:     Bro what you need to do is --you need to get that --like, there's that shit bro it's like 2 letter and 2 numbers, like something, something 18 and uh, if you, you know what I'll find it and uh like, I'll give you the chemical compound of what its' called and if you can get that bro like.

AP:     Is it W18?

JK:     That might be it. I don't know that might be it, I'll have to look.

AP:     Is it, is it a form of Fet or is it [U/I]

JK:     No what it is is -- its' ah uh, what it is is --college students discovered this chemical compound like years ago and it gave you the same effect as opiates, but it did nothing for pain.  So they couldn't use it medically.

AP:     You talking about U47700.

JK:     Uh that's a lot of numbers I don't know if its that but anyway.

AP:     It's U4-- it's U-47700.

JK:     Well say if thats it, so these college kids found it and they tried, and they did it on, tested it on mice and it didn't do anything with your pain receptors so it couldn't it had no basically it had no medical use but it did the same it gave you the same euphoria feeling as opiates. And they just threw it up on a shelf and never did anything with the chemical compound. Well, years later these f***ing Chinese chink motherf***ers developed like, was f***ing around in the lab and these chemists discovered the same chemical compound and they was sending it over you know what I mean sending that shit over that they say that if you know if you, you know, if you say if its like raw diggity and your hands happen to you know touch it like you go from just doing that like you can be done for.

AP:     It's that car cuz.

JK:     Yeah its' car too but not, it's car too, but this is the same thing, like same you what I mean they say that it's uh they say that [voices overlap]

AP:     If you find it and tell me what it is cuz I'll find it

JK:     They say that it's a thousand times stronger than morphine and a hundred times stronger than fentanyl or maybe it was ten thousand.

AP:     Thats the exact same definition as car cuz.

44

JK:     Well they got this shit it is car but its a, I'll get the chemical, I'll get you what
        they call the chemical and you, f***in [voices overlap]
AP:     Aight
JK:     Just work your magic, but I want in [voices overlap]
AP:     [U/I]
JK:     Aight
AP:     I'm at the house, aight
JK:     Dippin out
AP:     One
JK: [Laughing]

Call ends.

104.    Based on your Affiant's training and experience, and your Affiant's knowledge

from this investigation, during the above-referenced KUSHIK advises PELUSO that an

unspecified female drug customer of PELUSO's, who was recently encountered by law

enforcement after being supplied drugs by PELUSO at his (PELUSO's) residence, is cooperating

with law enforcement.  KUSHIK further surmises that this same female most likely has already

identified PELUSO as her drug supplier and she or an undercover officer have made or will

attempt to make a controlled drug purchase off of PELUSO at the direction of law enforcement.

KUSHIK warns PELUSO that he (PELUSO) is not immune from law enforcement scrutiny and

KUSHIK does not want to get caught by law enforcement.  PELUSO tells KUSHIK that he

believes the same and that he is not stupid.  KUSHIK further advises PELUSO that he

(KUSHIK) hopes PELUSO has removed all illegal drugs from his (PELUSO's) residence.

PELUSO affirms.  KUSHIK advises PELUSO that it is KUSHIK's practice to not keep any large

quantity of drugs at his residence.  KUSHIK explains that at times that he may have a significant

amount of drugs at his residence but if that is the case the drugs are only there briefly so

KUSHIK does not get caught with them.  PELUSO affirms.  KUSHIK again advises PELUSO

not to store large amounts of drugs at his residence.  PELSO affirms.  KUSHIK tells PELUSO

that it is best to stash drugs at various storage units and that KUSHIK currently has

approximately five (5) storage units that he (KUSHIK) pays for approximately $24.00 per month.  PELUSO affirms.  PELUSO reminds KUSHIK that PELUSO told KUSHIK about the storage units soon after KUSHIK was released from prison.  KUSHIK affirms.  PELUSO tells KUSHIK that PELUSO advised KUSHIK of the same, to store drugs and drug proceeds at various storage units so he (PELUSO) is aware of how to utilize storage units to protect drug supplies and drug proceeds.  KUSHIK responds to PELUSO and tells PELUSO that he (KUSHIK) has taken it to an extreme and has multiple storage units that are in various names of third-party individuals.  Further, these storage units are located at various geographic locations and KUSHIK utilizes them all intermittently in order to further protect his drug supply. KUSHIK explains that one (1) of these storage units is located very far away from where KUSHIK operates, he rarely goes there, and this is where he keeps the large portion of his drug proceeds.  PELUSO affirms.  KUSHIK reiterates that he (KUSHIK) rarely goes to that particular storage unit only when he needs to add drug proceeds to that location.  PELUSO affirms. KUSHIK again advises PELUSO that these storage units are worth it due to the fact that they are so affordable.  PELUSO affirms and advises KUSHIK that there is a storage unit facility right across the street from PELUSO's residence.  KUSHIK tells PELUSO that if he were PELUSO he (KUSHIK) would stop selling drugs at his residence as the police will be watching him (PELUSO).  KUSHIK describes that he will not take any risk when going to traffic drugs at certain locations where there is a large law enforcement presence and will go to extremes to make sure he (KUSHIK) is not caught with drugs, including hiding the drugs internally in his rectum until he is ready to meet his drug customer.  PELUSO affirms.  KUSHIK tells PELUSO he takes it very seriously and does not take any chances.  PELUSO advises KUSHIK that he (PELUSO) was trafficking drugs with no issues when he first moved to his residence and once

law enforcement identified him (PELUSO) as a drug trafficker they now are heavily scrutinizing him and his customers.  PELUSO tells KUSHIK that is why he is moving from his current residence and that he only has three (3) months left on his lease.  KUSHIK advises PELUSO that he is going to watch a show with his girlfriend and that he will speak with PELUSO later. PELUSO affirms and tells KUSHIK that PELUSO will advise KUSHIK if he has any updates on the status of a methamphetamine or cocaine resupply.   PELUSO then tells KUSHIK for KUSHIK to advise PELUSO if KUSHIK has any updates on the status of a heroin resupply. KUSHIK tells PELUSO to let KUSHIK know as soon as PELUSO meets with his methamphetamine source of supply.  PELUSO affirms.  KUSHIK further asks about the status of when PELUSO will be resupplied with cocaine.  PELUSO advises KUSHIK that is what he (PELUSO) was updating KUSHIK about.  KUSHIK clarifies that he (KUSHIK) is not talking about methamphetamine but cocaine.  PELUSO understands and laughs now that the drug in question has been clarified.  KUSHIK clarifies again that he (KUSHIK) is talking about the status of PELUSO's cocaine supply.  PELUSO tells KUSHIK that it is the same as before. KUSHIK asks PELUSO if he has a current cocaine supply.  PELUSO clarifies that the cocaine is not physically with PELUSO but PELUSO has access to it and it is the same quality as the last time PELUSO sold cocaine to KUSHIK.  KUSHIK asks PELUSO how much it will cost for him to obtain one (1) ounce of cocaine.  PELUSO tells KUSHIK that it will cost him $1,700 dollars per ounce.  KUSHIK complains that the price is extremely high.  PELUSO confirms that is the current price.  KUSHIK tells PELUSO that the price of one (1) ounce of cocaine should be approximately $1,500.   PELUSO advises KUSHIK that he (KUSHIK) can ask PELUSO's girlfriend to confirm the price and PELUSO was only able to most recently obtain approximately five (5) ounces of cocaine and that on other recent occasions he has been able to get

approximately seven (7) or nine (9) ounces of cocaine.  PELUSO reaffirms that he most recently

was able to obtain approximately five (5) ounces of cocaine.  PELUSO details to KUSHIK that if

he (PELUSO) is able to sell one-quarter ounce of cocaine for approximately $500 he will make

approximately $300 per ounce of cocaine.  Essentially, selling one (1) ounce of cocaine in one-

quarter ounce increments for a grand total of approximately $2,000 while he (PELUSO) is

paying approximately $1,700 per ounce of cocaine.  PELUSO explains that this buy-to-sell ratio

allows PELUSO to pay his bills and hopefully PELUSO's cocaine supplier will be able to

consistently supply PELUSO with cocaine; however, on occasion it can be one (1) to several

weeks before he (PELUSO) is able to be resupplied with cocaine.  KUSHIK advises PELUSO

that he (KUSHIK) is hopeful that he (KUSHIK) is able to make a connection with one (1) of his

previous cocaine suppliers that has a steady supply of cocaine available to sell.  PELUSO

affirms.  KUSHIK conveys to PELUSO that he (KUSHIK) encountered an unnamed cocaine

supplier recently and that KUSHIK purchased approximately one eighth of an ounce of cocaine

from the supplier but the quality of the cocaine was poor.  PELUSO advises KUSHIK that the

quality of cocaine amongst all of PELUSO's associates and suppliers is currently poor.

KUSHIK affirms.  PELUSO tells KUSHIK that all the cocaine traffickers who previously had

high quality cocaine now only have poor quality cocaine because they are adding "cut" to the

cocaine in order to increase their supply of cocaine since there is a cocaine shortage.  KUSHIK

advises PELUSO that he (KUSHIK) has just not come across the right cocaine supplier yet that

he knows.  PELUSO and KUSHIK discuss that the COVID-19 pandemic has greatly impacted

the availability of cocaine and also has slowed traffic into the U.S. borders and cut off the supply

of cocaine.  KUSHIK tells PELUSO that cocaine base is still readily available all over the

Northside of Pittsburgh.  KUSHIK advises PELUSO if he can run into cocaine and cocaine base

traffickers that KUSHIK identifies as "KO", "J-DUB", "PEEPERS", or "BABY P-MAC" that he and PELUSO will be able to find a reliable source of cocaine supply.  KUSHIK tells PELUSO that, in order to find a steady cocaine supply, KUSHIK is ready to travel to North Charles or Sheffield Street on the Northside of Pittsburgh.  PELUSO advises KUSHIK that PELUSO's supplier has not let him down yet and has stated to PELUSO that the COVID-19 pandemic has greatly affected the cocaine supply.  KUSHIK and PELUSO discuss that the U.S. borders and travel restrictions will hopefully begin to reopen and lift after September.  KUSHIK tells PELUSO that it is hard to believe that the heroin suppliers in the Pittsburgh area had such a large supply of raw heroin that the heroin trade has not been affected by the COVID-19 pandemic. KUSHIK further tells PELUSO that KUSHIK told his girlfriend that you can make one (1) kilogram into several kilograms by adding cutting agents to the heroin.  KUSHIK tells PELUSO that is why he (KUSHIK) believes the quality of heroin has decreased in Pittsburgh lately. PELUSO confirms and advises KUSHIK that if you have the right additive or cutting agent an individual can turn one (1) kilogram of heroin into approximately six (6) or seven (7) kilograms of heroin.  KUSHIK affirms.  PELUSO tells KUSHIK if you add tranquilizers and similar drugs to the heroin it will not greatly reduce or effect the potency.   KUSHIK and PELUSO discuss additives/cutting agents that can be purchased online to add to the heroin.  PELUSO discloses to KUSHIK that he (PELUSO) is savvy online and has been trying to obtain a shipment of carfentanil but is having difficulty.  PELUSO and KUSHIK discuss obtaining medical grade fentanyl or carfentanil derivative that was developed by college students for medical use identified as "U47700".  KUSHIK and PELUSO discuss that the Chinese have developed and manufactured a similar chemical compound that are fentanyl or carfentanil derivatives.  These compounds are significantly stronger than morphine and fentanyl.  KUSHIK directs PELUSO to

determine if he can obtain these compounds.  PELUSO affirms.  PELUSO and KUSHIK agree to talk later.

105.    On November 16, 2020, law enforcement obtained a subpoena return from EXTRA SPACE STORAGE, which revealed that WALKER was currently renting UNIT NUMBER 3112, at EXTRA SPACE STORAGE, 880 Saw Mill Run Boulevard, Pittsburgh, PA 15226 (SEARCH LOCATION 8).  On the account information WALKER listed the address as 3006 Shadeland Ave, Pittsburgh, PA 15212.

106.    Based upon this investigation it is your Affiant's belief that WALKER is renting SEARCH LOCATION 8, at the direction of KUSHIK, as an alternate location for KUSHIK to store and safeguard drugs or drug proceeds.

### 9)    SEARCH LOCATION 9: 245 Alice Street, APT 1, Pittsburgh, PA 15210 (Darian WOFFORD)

107.    As set forth more fully above, WOFFORD has been charged in Indictment No. 3 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One) and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance (Count Two), all in violation of 21 U.S.C. § 846.

108.    Investigators obtained authorization to intercept, among others, two (2) telephones operated by KUSHIK, TT4 and TT7, as detailed more fully above and herein.

109.    WOFFORD was intercepted over KUSHIK's telephone communicating with KUSHIK and identified and one of KUSHIK's suspected cocaine and heroin sources of supply.

110.    For example, on November 3, 2020, at approximately 12:35 PM, WOFFORD (DW), utilizing (412) 728-8921, made an outgoing call to KUSHIK (JK), who was utilizing TT7:

JK:    Jump in this whore, would I? I tried calling you the other day [U/I] going straight to voicemail. What's the name?

DW:    The names is uhhh, hold on, hold on, hold on. You liked them last ones right?

JK:    Them hemis, yeah.

DW:    Yeah the hemis. Yeah, these are just like them hemis, yeah these ain't just like them, but these, these are actually better. No, I got some, uh, I got some, damn what the f*** did I say? I hate that shit when I can't read that shit, open up the...uh uh these is Warning Hazard, Warning, Warning Rich Hazard. I got the, I got Warning Rich Hazard. That's what I got bro. Warning Rich Hazard, uh, I only got 3 of them. Um, the stand, the stand up ones I gave you, the ones that was just standing up [U/I]

JK:    People like the Devil Law.

DW:    Yeah, yeah I got 3, 3 of them stand up joints, 2 of these Double Seals, 2 of these Double seals are [U/I]

JK:    What the heck now, a Red Bull

DW:    Nah, these aint' Red Bull. They got like a uh, Olympic sign on the front but I can't find the clear one to see what the f*** it say yo. Hold up. I can't [U/I] the f***in...

JK:    Uh, well listen, I just jumped in my man's car. Let me do this with him. I'll call ya. Been waiting for me for a minute, f***ing getting rid of this [U/I] I'll call you right back

DW:    Infinities

JK:    Infinities

DW:    They called Infinities

JK:    [U/I]

DW:    Alright

111.    Based on your Affiant's training and experience, and your Affiant's knowledge from this investigation, during the above-referenced conversation, KUSHIK tried to call WOFFORD a previous day but it went to WOFFORD's voicemail.  KUSHIK asks WOFFORD for the name of the brand of heroin they previously discussed.  WOFFORD tells KUSHIK to wait while WOFFORD thinks about it, and then asks KUSHIK if he liked the brand of the last heroin stamp bags.  KUSHIK tells WOFFORD the stamp, another term for brand, on the heroin bag was "hemis".  WOFFORD affirms.  WOFFORD informs KUSHIK that the new heroin stamp bags are just like the "hemis", but then backtracks and states they are not like the "hemis" brand, they are better.  WOFFORD states that he cannot read the stamp off of the heroin that he presently is in possession of but then informs KUSHIK that after opening the package, he can

see that it has the "Warning Rich Hazard" stamp on it.  WOFFORD further states that he only has "3 of them", which is a reference to three (3) bricks (or grams) of the "Warning Rich Hazard" brand of heroin.  KUSHIK tells WOFFORD that KUSHIK's drug customers liked the "Devil Law" brand of heroin.  WOFFORD reiterates to KUSHIK that he has three (3) bricks of the "Warning Rich Hazard" brand of heroin.  WOFFORD also has two (2) bricks of the "Double Seals" brand of heroin.  KUSHIK asks WOFFORD if the heroin stamp bags are the "Red Bull" brand.  WOFFORD tells KUSHIK that the stamp bags are not that brand.  WOFFORD tells KUSHIK that the heroin stamp bag has the "Olympic sign" on the bag, but WOFFORD cannot read it.  KUSHIK then advises WOFFORD that he just entered another individuals' vehicle and tells WOFFORD that KUSHIK has to perform a drug deal with the unknown male (UM), an associate of KUSHIK's, who is also a drug dealer, first.  KUSHIK states that UM has been waiting on KUSHIK for a while.  WOFFORD tells KUSHIK the name of the heroin stamp that he was trying to figure out earlier in their conversation is "Infinities".  KUSHIK affirms. WOFFORD again states the stamp bags are "Infinities".   KUSHIK states something unintelligible.  WOFFORD acknowledges it.[6]

112.    On October 9, 2020, law enforcement conducted surveillance in the vicinity of 245 Alice Street, APT 1, Pittsburgh, PA 15210 (SEARCH LOCATION 9).  Law enforcement observed WOFFORD and WOFFORD's suspected girlfriend exit what appeared to be the

---

[6]    Your Affiant believes, based upon subsequent communications, that this drug transaction between WOFFORD and KUSHIK occurred.  Specifically, on November 6, 2020, WOFFORD, using the (412) 728-8921 and KUSHIK, using (412) 316-7963, exchange several communications wherein they make arrangements for WOFFORD to supply KUSHIK with "3 whole ones and two buns" of the "Warning Hazards" or "Stand Up" brand of heroin – that is, approximately 3.4 grams of heroin.  KUSHIK instructs WOFFORD to meet KUSHIK at "Shadeland," which your Affiant believes, based upon this investigation, to be a reference to KUSHIK's sister's residence located at 3006 Shadeland Avenue, where investigators, including your Affiant, believe KUSHIK stores controlled substances.  At approximately 10:00 PM, on November 6, 2020, WOFFORD informs KUSHIK that he will arrive "in 6 minutes" and, then, at 10:06 PM, WOFFORD advises KUSHIK that he has arrived to meet KUSHIK.

side/rear door of the residence located at SEARCH LOCATION 9.  Your Affiant is aware that SEARCH LOCATION 9 is situated at the corner of Alice Street and Grimes Avenue. WOFFORD and his suspected girlfriend were observed entering a white Mercedes Benz, which was parked behind 301 Alice Street (the residence located across the street from SEARCH LOCATION 9.  The suspected girlfriend entered the driver's seat of the white Mercedes Benz and WOFFORD entered the front passenger seat.  The Mercedes Benz traveled down Grimes Avenue and turned right onto Alice Street.  Shortly thereafter, law enforcement observed a silver Mercedes Benz, bearing PA registration LLV4616, driven by WOFFORD, park in the rear of 301 Alice Street, where the white Mercedes Benz had previously been parked.   WOFFORD was observed exiting the vehicle, walked across the street to the sidewalk near the vicinity of SEARCH LOCATION 9.  Subsequently, the white Mercedes Benz, operated by WOFFORD's suspected girlfriend parked on Grimes Avenue in close proximity to SEARCH LOCATION 9. WOFFORD and his suspected girlfriend were observed speaking to one another at the driver's side door of the white Mercedes and then proceeded to enter SEARCH LOCATION 9 through the rear door of the structure.

113.     Searches of Law enforcement data bases revealed that the silver Mercedes Benz, bearing PA registration LLV4616, is registered to Darian WOFFORD at 2909 Shadeland Avenue, Pittsburgh, PA 15212.

114.     Searches of the law enforcement database, CLEAR, revealed that SEARCH LOCATION 9's address is associated with a credit check under WOFFORD's girlfriend's name as of October 31, 2020.   Additionally, searches of the law enforcement database, CLEAR, revealed that 245 Alice Street, Pittsburgh, PA 15210 is associated with a utility listing under WOFFORD's name as of July 29, 2020.

115.    On October 6, 2020, the Honorable Lisa Pupo Lenihan, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2027, authorized a search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by WOFFORD, (412) 944-3374, from Sprint/T-Mobile.  As of November 2020, data obtained from the GPS/E911 location data relating to this telephone number, utilized by WOFFORD, revealed locations frequented by WOFFORD, including: the vicinity of SEARCH LOCATION 9.

116.    Additionally, in December 2020, investigators, conducting surveillance, again observed WOFFORD and his suspected girlfriend exiting SEARCH LOCATION 9.

### 10.    SEARCH LOCATION 10: 316 Elsdon Street, Pittsburgh, PA 15214 (Gary HAIRSTON)

117.    As set forth more fully above, HAIRSTON has been charged in Indictment No. 3 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One) and 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance (Count Two), all in violation of 21 U.S.C. § 846.

118.    Investigators obtained authorization to intercept, among others, two (2) telephones operated by KUSHIK, TT4 and TT7, as detailed more fully above and herein.

119.    HAIRSTON was intercepted over KUSHIK's telephone communicating with KUSHIK and identified and one of KUSHIK's suspected cocaine and heroin sources of supply.

120.    For example, on November 8, 2020, between 2:28 PM and 2:31 PM, HAIRSTON (GH), utilizing (412) 277-1248, placed an outgoing call to KUSHIK (JK), who was using telephone number TT7:

JK:    Hello
GH:    Yea

JK:     What up with it? F***ing, I ain't gonna lie to you bro. It's out, I mean, you can, I'm gonna uh, it's up to you bro, umm I'm over the north now. I don't got it all on me bro. I got cameras at the crib. I caught my bitch, she came, she took some other dude there and got cracked like, so I just left. I mean I can get to the bread, but I don't feel like going back there right now, bro. You know what I mean?

GH:    What you say just happened?

JK:     She took another mother f***er to the crib and got f***ed

GH:    She don't know you got a camera there?

JK:     Yea bro, that's what I'm like are you stupid? I mean it's only at the front door but, like

GH:    Who your girlfriend

JK:     Yea

GH:    [laughs]

JK:     I'm like, what, umm like are you dumb? Like I don't.

GH:    Who was it?

JK:     [name removed]

GH:    Oh well she, you know how that is she must of caught you cheating and got some get back

JK:     Yea that's exactly what it is. I mean I don't, I mean that's whatever

GH:    She shouldn't have gone back to the crib. Now she's going to far

JK:     Yea that's what I, my exact words bro. My exact words bro

GH:    You can get some dick, but don't bring it back to the crib

JK:     Yea, dawg, like what are you, that's supposed to be like the safe zone, like you don't do that

GH:    I got you though, what are you going to straighten me out bro?

JK:     Yea bro, I got, bro you know I got that. I got probably like I don't know like four on me. I grabbed a little wad when I left. But I just don't feel like going there right now bro

GH:    What you need to do?

JK:     I'm out like, mother f***ers are calling me, I'm on Shadeland, but I'll drive down usual spot if you want me to?

GH:    Alright go down there

JK:     Alright I'll be there in a minute

121.    Based on your Affiant's training and experience and your Affiant's knowledge from this investigation, during the above-referenced conversation, KUSHIK and HAIRSTON exchange greetings. KUSHIK advises HAIRSTON that he is going to be honest with him and tells HAIRSTON that he is currently on the North Side of Pittsburgh but that it is up to HAIRSTON whether or not he wants to conduct the narcotics transaction. KUSHIK indicates that he does not currently have all of the money that he owes HAIRSTON for their previous and

pending narcotics transactions. KUSHIK begins to describe that he caught his girlfriend cheating with another man. KUSHIK advises HAIRSTON that if necessary he could obtain the money the he owes to HAIRSTON but because of the current circumstances with his girlfriend he would rather not go to the residence that he shares with his girlfriend to obtain the money.  HAIRSTON acknowledges and sympathizes with KUSHIK.  HAIRSTON inquires when KUSHIK will be able to provide the next payment.  KUSHIK advises HAIRSTON that due to his current situation he would be able to pay approximately $4,000 now towards his outstanding drug debt. HAIRSTON inquires about KUSHIK's current level of heroin supply. KUSHIK informs HAIRSTON that he is currently out of heroin and that drug customers are currently calling KUSHIK and are in need of heroin. HAIRSTON advises KUSHIK to go to an unspecified, predetermined location in order to facilitate a heroin transaction for the money that KUSHIK currently has available. KUSHIK agrees.

122.    On October 28, 2020, law enforcement, conducting surveillance in the vicinity of 316 Elsdon Street, Pittsburgh, PA 15214 (SEARCH LOCATION 10), observed HAIRSON enter a Dodge pickup truck, bearing PA registration ZPZ4709, and depart the area.  The Dodge pickup truck, bearing PA registration ZPZ4709, was parked in close proximity to SEARCH LOCATION 10.  Shortly thereafter, law enforcement observed who they believed to be HAIRSTON's son exit a BMW, bearing PA registration KZV9732, and proceed to enter the front door of SEARCH LOCATION 10.

123.    Searches of law enforcement data bases revealed that the Dodge pickup truck, bearing PA registration ZPZ4709, and the BMW, bearing PA registration KZV9732, is registered to someone other than HAIRSTON and/or HAIRSTON's son and to an address not readily associated with HAIRSTON and/or HAIRSTON's son.

124.     On October 2, 2020, the Honorable Maureen P. Kelly, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2005, authorized a search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by HAIRSTON, (412) 808-4774, from Sprint/T-Mobile.  As of December 2020, data obtained from the GPS/E911 location data relating to this telephone number, utilized by HAIRSTON, revealed locations frequented by HAIRSTON, including: the vicinity of SEARCH LOCATION 10.

### 11.     SEARCH LOCATION 11: 639 Churchill Avenue, Pittsburgh, PA 15235 (Randy CAMACHO)

125.     As set forth more fully above, CAMACHO has been charged in Indictment No. 3 with conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance (Count One), in violation of 21 U.S.C. § 846.

126.     Investigators obtained authorization to intercept, among others, two (2) telephones operated by KUSHIK, TT4 and TT7, as detailed more fully above and herein.

127.     CAMACHO was intercepted over KUSHIK's telephone communicating with KUSHIK and identified and one of KUSHIK's suspected cocaine sources of supply.

128.     For example, on November 8, 2020, between 2:11 PM and 2:16 PM, CAMACHO (RC), utilizing (412) 760-4520, placed an outgoing call to KUSHIK (JK), over TT7, below is a transcription of the pertinent portion of the call:

JK:     If you come across any of the girl that's better, let me know
RC:     I can get, I can get it now. He wants 24
JK:     Yeah I can't, I can't [voices overlap]
RC:     That's what I'm sayin it's high, he's tryin to play, I probably, I mean I might be able to get it maybe 22 I don't know but, he told me 24 that's why I ain't even call him back
JK:     Yeah I can't, it would have to be, I mean there's mother f***ers sayin they got it for 16 but it's just they tryin to make something off of it

RC:   Yeah that's [stutters] that's the whole thing I was tryin to say, everybody saying they got it for 16 but nobody producin it and when they do produce it they're puttin cut on it

JK:   See my man came through but he only had two (2) of them and it just, it's just all a bunch of bullshit [voices overlap]

RC:   If you buy that broccolli, my man said you buy that broccoli and buy more than 10 you can get it for 8

JK:   Yeah I mean I'ma holler at a couple people I just don't wanna take it unless it's already there. I'm waitin for this f***in dude I don't know where the f*** he's at man, I'ma hit you in a litttle bit because I just don't wana be standin on this phone

RC:   I mean I'm sayin you want me to try and find the other? Hello? Yo?

JK:   What you say?

RC:   I said [stutters], you want me to-- I mean I'll call my other dude you want me to see if it's something, if he can, if it's something I can get for a lower price?

JK:   What? The sugar?

RC:   Yeah

JK:   Yeah I mean if you can get it for like even 18 I'll grab 'em

RC:   I mean how many you want if I can get it for that number cause I' might be able to tell him you want maybe something nice [voices overlap]

JK:   I mean, I can't You gotta give me a little bit, like all that shits going on I can't tell you right this second exactly everything. It will probably be tomorrow.

RC:   Keep me in touch man cause I'll make a phone call and see if I can get some shit for the right number, at least an eighthy of some shit I could probably get for that number

JK:   Yeah yeah I'll grab an eighthy for that

RC:   Aight

JK:   Aight

129.   Based on your Affiant's training and experience, and your Affiant's knowledge from this investigation, during the above-referenced conversation, KUSHIK advises CAMACHO that if CAMACHO is able to acquire a quantity of cocaine ("the girl") for a better price than previously discussed to let KUSHIK know and that KUSHIK would then purchase cocaine from CAMACHO. CAMACHO informs KUSHIK that he is currently able to obtain ounces of cocaine for $2,400. KUSHIK advises CAMACHO that he is not willing to purchase the cocaine for that high of a price. CAMACHO agrees with KUSHIK that the price is high and then informs KUSHIK that he may be able to negotiate with the supplier to possibly lower the price to $2,200, but is unsure if the supplier would be willing to agree to a lower price at this

time.  KUSHIK advises CAMACHO that he has alternate sources of supply of cocaine that are charging $1,600 per ounce of cocaine but that KUSHIK believes those suppliers are adding cutting agents to the cocaine, to increase the quantity in order to make more of a profit from their supply. CAMACHO agrees with KUSHIK and tells KUSHIK that he is also aware of alternate sources of supply that are saying they have cocaine available for $1,600 per ounce, but that these suppliers are not actually in possession of the cocaine or if they are in possession of the cocaine they bring cocaine that has been mixed with cutting agents which significantly decreases the quality of the cocaine. KUSHIK agrees with CAMACHO.  CAMACHO informs KUSHIK that if he is interested in purchasing pounds of marijuana ("broccoli") that CAMACHO's marijuana supplier is willing to lower the price to $8,000 per pound if KUSHIK agrees to purchase ten (10) pounds or more.  KUSHIK advises CAMACHO that he has to talk to his customers to see if they are interested in acquiring that much marijuana. CAMACHO asks KUSHIK if he wants CAMACHO to try and call his other suppliers to find a supply of cocaine ("sugar") for a lower price.  KUSHIK advises CAMACHO that if CAMACHO can obtain ounces of cocaine for $1,800 that KUSHIK would be interested in purchasing the cocaine.  CAMACHO asks KUSHIK how many ounces KUSHIK would want to purchase if CAMACHO is able to get a supplier to agree to that price, because if CAMACHO could tell that supplier that KUSHIK is going to purchase a large quantity that may persuade the supplier to agree to the lower price. KUSHIK advises CAMACHO that he is currently unable to provide CAMACHO with that specific information because he has a lot going on in his personal life. CAMACHO tells KUSHIK to keep him informed because he may be able to acquire a quantity of cocaine for a good price, at least an eighth of a kilogram. KUSHIK advises CAMACHO that he would be interested in

purchasing an eighth of a kilogram for that price. CAMACHO acknowledges KUSHIK and the call ends.

130.     On November 20, 2020 law enforcement conducted surveillance in the vicinity of SEARCH LOCATION 12.   Law enforcement observed CAMACHO and CAMACHO's suspected wife exit a purple Mercedes Benz, bearing PA registration LJT5706, which was parked in the driveway of SEACH LOCATION 12.

131.     Searches of Law enforcement data bases revealed that the purple Mercedes Benz, bearing PA registration LJT5706, is registered to Randy Jason CAMACHO and his suspected wife at 1836 Lowrie ST, APT 1F, Pittsburgh, PA 15212.

132.     Searches of the law enforcement database, CLEAR, revealed that 639 Churchill Avenue, Pittsburgh, PA 15235 was associated with a utility listing under CAMACHO's suspected wife's name as of November 14, 2020.

133.     In November 2020, Pennsylvania State Parole Officers informed investigators, including your Affiant, that CAMACHO listed his current address with the parole office as the address associated with SEARCH LOCATION 12.

134.     On November 23, 2020, the Honorable Lisa Pupo Lenihan, United States Magistrate Judge for the Western District of Pennsylvania, at Mag. No. 20-2383, authorized a search warrant for the disclosure of GPS/E911 location data relating to a telephone utilized by CAMACHO, (412) 760-4520, from Verizon.  As of December 2020, the GPS/E911 location data relating to this telephone number, utilized by CAMACHO, revealed locations frequented by CAMACHO, including: the vicinity SEARCH LOCATION 12.

VI.     **CONCLUSION**

135.    Based on information set forth herein, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES will be found at the SEARCH LOCATIONS as described herein and more fully described in Attachment A hereto and to each of the proposed search warrants.

136.    Your Affiant, therefore, respectfully requests that the attached warrants be issued, authorizing the search and seizure of the items identified in Attachment B to each search warrant.

137.    It is further respectfully requested that this Court issue an Order sealing, until further order of Court, all papers submitted in support of this Application, including the Application, Affidavit, and the Search Warrants, and the requisite inventory notice (with the exception of one (1) copy of the warrant and inventory notice that will be left at each of the SEARCH LOCATIONS.  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this Affidavit and related documents may have a negative impact of this continuing investigation and may jeopardize its effectiveness.

The above information is true and correct to the best of my knowledge, information and belief.

_____*/s/ John Ypsilantis*_____
JOHN YPSILANTIS
Special Agent
Federal Bureau of Investigations

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 4th day of December, 2020.

_____
HONORABLE LISA PUPO LENIHAN
United States Magistrate Judge
Western District of Pennsylvania

## Attachment A-1

**THE BUILDING, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AT 156 Nichol Avenue, Mckees Rocks, PA 15136 (Also listed as 156 Ohio Street, Mckees Rocks, PA 15136.  Also Listed as 154 Ohio Street, Mckees Rocks, PA 15136)** (SEARCH LOCATION 1), which is described as a red brick building with multiple windows. The building is marked with a sign that reads "156 Nichol Avenue" on a grey door.





## <u>Attachment A-2</u>

<u>**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 25 Deerton Road, Cheswick, PA 15024**</u> (SEARCH LOCATION 2), which is described as having greenish yellow siding with brown trim and a brown garage door as well as stairs leading to a porch that provides access to the front door of the residence.



**Attachment A-3**

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 124 Earl Street, Pittsburgh, PA 15204** (SEARCH LOCATION 3), which is described as a row style home with white/gray siding, white-trimmed windows and a white awning covering a white storm door.



## Attachment A-4

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 308 Campbell Street, Apartment B, McKees Rocks, PA 15136** (SEARCH LOCATION 4), which is described as a multi-family unit with yellow brick and brown siding. The entrance to Apartment B is located in the rear of the building on the second floor and has a white storm door (see second photograph).





**Attachment A-5**

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AT 2780 Hunters Circle, Apartment 421, Allison Park, PA 15101** (SEARCH LOCATION 5), which is described as a multi-family, residential apartment building with red brick.  The subject apartment is marked "421" and located within the apartment complex listed as Devlin's Point.



**Attachment A-6**

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 150 Southern Avenue, Apartment 3, Pittsburgh, PA 15211 (Also listed as 150 Southern Avenue, Basement Apartment, Pittsburgh, PA 15211)** (SEARCH LOCATION 6), which is described as a multi-family, residential unit with a white brick and white siding façade, arched entrance way leading to a covered porch, with multiple entrances – that is, the front and rear/side.





**Attachment A-7**

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 3006 Shadeland Avenue, Unit #2, Pittsburgh, PA 15212** (SEARCH LOCATION 7), which is described as a multi-family, residential unit with two (2) white doors located on the front of the building, tan siding, light brown stucco façade and brown trim.  Unit #2 is accessed by way of the all-white door on the right side of the residence, when facing the residence.



**Attachment A-8**

**UNIT NUMBER 3112, EXTRA SPACE STORAGE, 880 Saw Mill Run Boulevard, Pittsburgh, PA 15226** (SEARCH LOCATION 8) including all safes and electronic devices located therein. The storage unit can be described as a unit marked "3112" located within Extra Space Storage Complex.



**Attachment A-9**

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 245 Alice Street, Apartment 1, Pittsburgh, PA 15210** (SEARCH LOCATION 9), which is described as a multi-family red brick building with multiple entrances, windows and fire escapes. Apartment 1 can be accessed via the concrete stairs that lead from the sidewalk to a walkway and then to another set of concrete stairs, which lead to the concrete covered patio and entry door.



**<u>Attachment A-10</u>**

**<u>THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 316 Elsdon Street, Pittsburgh, PA 15214</u>** (SEARCH LOCATION 10), which is described as a single-family home with white siding and concrete steps leading to a front porch and entry door.



### Attachment A-11

**THE RESIDENCE, CURTILAGE, ANY DETACHED STRUCTURES AND OUTBUILDINGS AS WELL AS ANY VEHICLES LOCATED ADJACENT TO OR THEREON AT 639 Churchill Avenue, Pittsburgh, PA 15235** (SEARCH LOCATION 11), which is described as a single-family home with red brick and white-trimmed windows, a white garage door, and a white entry door that can be accessed by several steps.



**ATTACHMENT B**

**LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED**

For the location(s) listed on the search warrant(s), including *where indicated in Attachment A to the search warrant* the residence, curtilage, garages, any detached structures and/or outbuildings, as well as any vehicles located adjacent to or thereon, this search warrant authorizes law enforcement to search for and seize evidence of violations of federal felony offenses enumerated in Title 21, United States Code, Sections 841(a)(1) (distributing and/or possessing with intent to distribute a controlled substances); 846 (conspiring to commit a drug trafficking crime); and Title 18, United States Code, Sections 922(g)(1) (felon in possession of firearms/ammunition), 924(c) (possession of a firearm in furtherance of a drug trafficking crime), (hereinafter the "TARGET OFFENSES"), including, but not limited to the following:

1.  controlled substances, including but not limited to heroin, cocaine, methamphetamine, and marijuana;

2.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags", microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and monetary transactions involving the proceeds from the sale of controlled substances;

4.  personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the TARGET OFFENSES;

5.  cash, currency, safes, gambling machines, and records relating to the generation of income from the sale of controlled substances or other illegal sales and the expenditure of such income, including money orders, wire transfers,  cashier's checks and receipts, bank statements, passbooks, checkbooks, checks, safe deposit box keys;

6.  registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as

1

diamonds;

7.      documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

8.      computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, and/or laundering the proceeds therefore, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

9.      security cameras and/or surveillance systems;

10.     items bearing the Pagan's Motorcycle Club insignia;

11.     firearms, dangerous weapons and/or explosives; and,

12.     identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises and/or subject communication devices.

For any computer, laptops, cell phones, tablets, gambling machines, or storage medium, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

1.      Any and all evidence related to the TARGET OFFENSES, including correspondence and/or communications,

2.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3.      evidence of software that would allow others to control the COMPUTER, such as

2

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4.      evidence of the lack of such malicious software;

5.      evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the COMPUTER user;

6.      evidence indicating the COMPUTER user's state of mind as it relates to the TARGET OFFENSES;

7.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

8.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

9.      evidence of the times the COMPUTER was used;

10.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

11.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

12.     records of or information about Internet Protocol addresses used by the COMPUTER;

13.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

14.     contextual information from the COMPUTER necessary to understand the evidence described in this attachment.

In searching the COMPUTER, the federal agents may examine all of the data contained in the COMPUTER to view its precise contents and determine whether the COMPUTER and/or data falls within the items to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

3

For those COMPUTERS found within a search location where multiple individuals, in addition to the target of this investigation are located, federal agents will make reasonable efforts to ascertain whether the COMPUTER is used by or belongs to a target of the investigation to facilitate the commission of the TARGET OFFENSES.  To the extent it becomes readily apparent that the COMPUTER was unlikely used in conjunction with or to facilitate in any way the commission of the TARGET OFFENSES, federal agents will not seize or search the COMPUTER beyond that which is necessary to ascertain the nature of its involvement in the TARGET OFFENSES.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, gambling machines, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.